**Affirmed in Part and Reversed in Part and Remanded and Memorandum Opinion filed December 4, 2025.**



In The

# Fifteenth Court of Appeals

---

### NO. 15-25-00027-CV

---

### NICHOLAS KREINES, DAVID P. RYAN, LIBERTY MINERAL PARTNERS LLC, NAK RESOURCES INC., AND CGR OIL AND GAS, LLC, Appellants

### V.

### ES3 MINERALS, LLC, Appellee

---

**On Appeal from the Business Court Division 3B**
**Travis County, Texas**
**Trial Court Cause No. 24-BC03B-005**

---

### MEMORANDUM OPINION

Appellants Nicholas Kreines, David Ryan, Liberty Mineral Partners LLC, NAK Resources Inc., and CGR Oil and Gas, LLC appeal from the Business Court's order modifying a temporary injunction that enjoined Appellants from selling to certain mineral-rights buyers associated with ES3 Minerals, LLC. We conclude that

(1) the temporary injunction order, as modified by the Business Court, is not adequately specific in referring to the known subsidiaries of ES3's buyers, (2) the order clearly sets forth the reasons for its issuance, (3) the amount of the bond does not adequately protect Appellants' interests as required by Rule 684, and (4) the remaining challenges to the temporary injunction are not properly before us because they concern portions of the injunction that were imposed by the original District Court and were not reviewed or reimposed by the Business Court. Accordingly, we affirm in part and reverse and remand in part.

## BACKGROUND

### *ES3 Minerals, LLC brokers mineral rights and protects its information*

ES3 Minerals, LLC is a mineral acquisition and sales company founded by Edward Stanton, III. The company is a brokerage, purchasing mineral rights from sellers and reselling these rights to buyers. The company utilizes a simultaneous closing process, in which it purchases these mineral rights at the same time it sells them. Over the years, Stanton has found success with this strategy, developing relationships with many buyers in the industry.

To maintain its competitive advantage, ES3 has various processes in place to protect the confidentiality of its information. Employees are required to sign confidentiality agreements before accessing ES3's information. In addition, ES3's employee handbook prohibits employees from disclosing customer, pricing, and software information.

ES3 organizes employees into three departments, known as "silos." First is the analyst department, which utilizes information from ES3's software platform to identify mineral interests and their owners. Second is the mineral acquisition department, in which employees called "producers" are tasked with convincing

mineral owners to sell their rights to ES3 at a price determined by the business development department and ES3's pricing models. Third is the business development department, which uses ES3's buyer and pricing information to sell the acquired mineral interests to a buyer. Stanton believes this silo structure helps to maintain the companies' confidentiality, and employees are given access to only the subset of ES3's information needed for their roles. Employees of one silo are prohibited from sharing information with employees in the other two, in accordance with ES3's confidentiality policies, and are admonished if they fail to comply with these policies.

### *Kreines and Ryan join ES3 and sign non-competes*

Nicholas Kreines and David Ryan are former ES3 employees. ES3 hired Ryan in 2018 as a producer in the acquisitions department in 2018. ES3 hired Kreines in 2019 to work with Stanton in the business-development department. Both Ryan and Kreines signed Confidentiality, Noncompetition, and Non-Solicitation Agreements upon employment.

These confidentiality agreements state that ES3 "has provided and will continue to provide . . . Confidential Information and trade secrets applicable to Employee's position under ES3's normal policies and procedures." "Confidential Information" includes, among other things, customer information, business strategies, pricing and cost information, and computer programs and software developed by ES3. Under the agreements, Ryan and Kreines were to refrain from using confidential information for another's benefit and disclosing it without ES3's consent.

The confidentiality agreements include a noncompete provision restricting Ryan and Kreines's ability to directly compete with ES3 and to solicit customers

during their employment and 24 months thereafter, stating specifically:

> 4. <u>Non-Competition: Non-Solicitation of Customers and Prospective Customers</u>. Employee acknowledges that in the course of fulfilling Employee's responsibilities to ES3, Employee will be a representative of the company to, and in some instances may be ES3's primary contact with, existing customers as of the Termination date and prospective customers with whom ES3 has contacted within the 24 month period preceding the Termination date (collectively, "Customers and Prospective Customers"). Employee agrees that the goodwill and relationships developed with ES3's Customers and Prospective Customers is a special, valuable and unique asset of ES3 and should be used for the exclusive benefit of ES3. Accordingly, Employee agrees that, during Employee's employment with ES3 and for twenty-four (24) months thereafter, regardless of the reason for or manner of termination, Employee will not, directly or indirectly, except in connection with Employee's employment with ES3:
>
> > (a) directly compete with ES3;
> >
> > (b) . . . carry on or be engaged in (or make preparations for carrying on or being engaged in), financially or otherwise, or advise in the establishment of, a Competing Business within the state of Texas . . . ;
> >
> > (c) induce, solicit or take away (or attempt to induce, solicit, or take away) any Customer or Prospective Customer of ES3 and/or encourage any Customer or Prospective Customer to discontinue or limit its relationship with ES3;
> >
> > (d) call on, solicit, perform services for or accept work from any Customer or Prospective Customer for the benefit of a Competing Business with which Employee becomes in any way affiliated; or
> >
> > (e) divert or discourage any Customer or Prospective Customer from entering into a business relationship with and/or obtaining products or services from ES3.

The agreements also restrict Ryan and Kreines's ability to "solicit, induce or encourage . . . any employee or officer of ES3 to terminate his/her relationship with

4

ES3, without the prior written consent of ES3."

After signing his agreement, Ryan received access to sales scripts, pricing formulas, and ES3's software platform. Kreines received access to relevant portions of the platform, as well as buyer and pricing information. Kreines also developed relationships with buyers in the industry, becoming the "face" of ES3 and being promoted to Vice President of Business Development.

### *Kreines and Ryan leave ES3 and Ryan launches Liberty Mineral Partners*

During their final months of employment at ES3 Minerals, LLC, Ryan and Kreines began planning their own minerals company. Ryan left ES3 in August 2023, thereafter launching Liberty Mineral Partners, LLC ("LMP"), a name which Kreines helped create in addition to suggesting the corporate form. ES3 alleges that in the ensuing months, Kreines, while still an employee at ES3, met with Ryan multiple times to discuss ES3's software and pricing.

Ryan considers LMP to be a direct competitor to ES3. Since its launch, LMP has sold to multiple buyers who previously bought from ES3. In addition, Ryan hired a former high-performing ES3 producer, Curtis Menchaca. Within ten months of its inception, ES3 has signed 28 deals and has generated about $20.2 million in total revenue, $6.7 million of which was profit. ES3 saw a revenue decline of nearly $10 million in 2024. ES3 has also seen a decrease in the number of deals with longstanding buyers, including some who were no longer responding to Stanton's outreach.

### *ES3 sues Kreines, Ryan, and LMP and get a temporary injunction*

In September 2024, ES3 filed suit in Travis County District Court, alleging misappropriation of trade secrets and breach of fiduciary duty against Kreines, breach of contract against both Ryan and Kreines, and tortious interference against

LMP. The court issued a temporary injunction, which prohibited Appellants from transacting with specific buyers with whom Kreines had worked in the 24 months prior to his departure from ES3. The order referred to these customers as "Plaintiff's Buyers." The District Court found a probable right to relief on each of ES3's claims that ES3 would suffer probable imminent and irreparable injury.

The temporary injunction specifically prohibited Kreines, Ryan, and LMP from entering or negotiating any transaction with Plaintiff's Buyers, encouraging Plaintiff's Buyers to discontinue their relationship with ES3, and soliciting any of ES3's employees for employment or terminating their employment with ES3. Attached to the original order was a confidential list[1] of the specific entities and contacts comprising "Plaintiff's Buyers," as well as a definition for "ES3 Buyers" meaning "any contact and/or decision maker who is/was associated with" such entities.

In finding evidence of probable, imminent, and irreparable harm, the court stated that ES3 had "shown the loss of exclusive use of its Trade Secrets, a loss of deals with specific buyers, a decrease in gross profits, and a loss of employees, which is likely to continue unless Defendants are enjoined." It further stated that Appellants "were closely associated with [ES3]'s goodwill, and by their actions they have diluted [ES3]'s goodwill with [ES3]'s Buyers and will continue to do so." The order listed trade secret misappropriation, loss of goodwill and customers, and breach of noncompetition agreements as irreparable injuries for which damages could not adequately remedied. The District Court further required a $25,000 bond to be paid by ES3. Appellants filed a notice of appeal in the Third Court of Appeals, and the case later was transferred to the Eighth Court of Appeals.

---

[1] The list as provided to this Court has been redacted.

***Appellants remove to Business Court, which hears motions to dissolve and modify***

After the District Court issued the temporary injunction order and the notice of appeal, Appellants removed this case to the Business Court of Texas, Third Division. *See* Tex. Gov't Code § 25A.006. The Eighth Court of Appeals then transferred appellate jurisdiction to this Court.

In the Business Court, Appellants filed a motion seeking to have the order dissolved for failure to comply with Rules 683 and 684 of the Texas Rules of Civil Procedure and an insufficient bond amount. ES3 filed a motion to modify the temporary injunction subject to its response to the motion to dissolve. After a hearing, the Business Court issued an Order Modifying Temporary Injunction and a modified temporary injunction. In the modified order, the Business Court noted that it did not conduct the underlying temporary injunction hearing or hear the evidence.

The modified temporary injunction further specified those entities considered "Plaintiff's Buyers" on the attached buyer list. The relevant language is included below:

> 13. The Court finds that Plaintiff's list of Plaintiff's Buyers attached to this order (which is marked CONFIDENTIAL) are ES3 customers for whom Kreines was a representative to and did business with on behalf of ES3 during the 24-month period preceding Kreines's termination date of January 31, 2024, and specifically includes the individuals and entities on the list as well as any subsidiaries of those entities that are known to be subsidiaries by Kreines, Ryan or LMP, and thus are within the definition of Customers and Prospective Customers under the Agreements ("**Plaintiff's Buyers**"). If an individual on the list begins working at a new entity, the new entity is not included within the definition of Plaintiff's Buyers, however the individual on the list remains within the definition of Plaintiff's Buyers and prohibitions on Kreines, Ryan and LMP in this order apply to transactions where they

have knowledge the individual is personally involved.

The Business Court declined to modify the bond. This appeal followed.

After the appeal was filed, Appellants later realized that the Business Court's modified order mistakenly retained the definition of "ES3 Buyers" on the buyer list. The Business Court amended the order to remove that definition.

## ANALYSIS

In five issues, Appellants challenge the temporary injunction on the grounds that (1) the order does not adequately specify the persons or entities with whom Appellants are enjoined from transacting business; (2) the order does not clearly set forth the reasons for its issuance, violating Rule of Civil Procedure 683; (3) the bond is insufficient to meet the requirements of Rule of Civil Procedure 684; (4) the evidence is insufficient to support a finding of a probable right to relief and imminent and irreparable harm; and (5) the temporary injunction improperly restrains conduct that does not violate the noncompete covenant's restrictions.[2]

## I.     Standard of Review

To obtain a temporary injunction, an applicant is not required to establish that it will prevail upon a final trial on the merits, but must plead and prove that it (1) has a cause of action against the opposing party; (2) has a probable right on final trial to the relief sought; and (3) faces probable, imminent, and irreparable injury in the interim. *State by & Through Off. of Att'y Gen. of Tex. v. City of San Marcos*, 714 S.W.3d 224, 234 (Tex. App.—15th Dist. 2025, pet. denied) (citing *State v. Hollins*,

---

[2] The noncompete and non-solicitation covenants in Ryan's Confidentiality, Noncompetition, and Non-Solicitation Agreement have expired. These covenants were only to last for 24 months after Ryan's final departure from ES3, which occurred in August 2023. The temporary injunction also only restricted Ryan's actions until August 23, 2025. Consequently, our opinion only addresses the temporary injunction as to Kreines and LMP. We dismiss Ryan's challenge to the temporary injunction as moot.

620 S.W.3d 400, 405 (Tex. 2020) (per curiam)).

Litigants generally are not entitled to temporary injunctive relief as a matter of right. *Walling v. Metcalfe*, 863 S.W.2d 56, 57 (Tex. 1993) (per curiam). We review an order granting a temporary injunction for abuse of discretion, mindful that the lower court has no discretion to determine what the law is. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002); *City of San Marcos*, 714 S.W.3d at 234. No abuse of discretion will be found if "some evidence reasonably supports the court's ruling." *Henry v. Cox*, 520 S.W.3d 28, 34 (Tex. 2017).

## II. The Temporary Injunction Order Is Not Adequately Specific with Respect to What Conduct is Enjoined.

In Appellants' first issue, they argue that the temporary injunction lacks specificity with respect to the prohibited conduct in question. In the Business Court and in this Court, Appellants have asserted that the injunction fails to fully identify the restricted buyers due to the vagueness of the "contact and/or decision maker" language in the District Court's original temporary injunction order. Further, Appellants contend that any attempts to identify these contacts would require them to violate the order's confidentiality restrictions. ES3 argues that the modified order adequately identifies the specific buyers.

Texas Rule of Civil Procedure 683 requires an order granting an injunction to be "specific in terms" and to "describe in reasonable detail and not by reference to the complaint or other document[] the act or acts sought to be restrained . . . ." Tex. R. Civ. P. 683. This requirement has teeth. As the Texas Supreme Court has recognized, when a court seeks to punish for disobedience of an order or command, the "order or command must carry with it no uncertainty, and must not be susceptible of different meanings or constructions." *Ex parte Hodges*, 625 S.W.2d 304, 306 (Tex. 1981) (citation omitted). "In other words, to be enforceable by contempt, the

9

order must clearly, specifically, and unambiguously state the conduct required for compliance." *In re Luther*, 620 S.W.3d 715, 722 (Tex. 2021) (per curiam). An injunction must "set forth the terms of compliance in clear, specific, and unambiguous terms so that the person charged with obeying the decree will readily know exactly what duties and obligations are imposed upon him*." Ex parte Chambers*, 898 S.W.2d 257, 260 (Tex. 1995).

Appellants' primary complaint on appeal is that the "contact/and or decision maker" language is unclear, but after the Appellants filed their opening brief, the Business Court removed the "contact/and or decision maker" language from the temporary injunction order. Accordingly, Appellants' challenge to the "contact/and or decision maker" language is moot.

Appellants nevertheless argue that even with that deletion, the temporary injunction still fails Rule 683's specificity requirement with respect to what conduct is prohibited. As modified, the order prohibits Appellants from selling to certain entities and their respective contacts with whom Kreines had done business within two years before his departure from ES3. The attached exhibit specifically identifies these "Plaintiff's Buyers," including "any subsidiaries of those entities that are known to be subsidiaries" by Appellants. According to Appellants, this "knowledge" requirement is fatal to Rule 683 specificity.

There is a split of authority in Texas law with respect to whether a court can satisfy Rule 683 by conditioning a temporary injunction's applicability on facts within the restricted party's knowledge in cases involving noncompete agreements that prohibit parties from dealing with a former employer's customers or clients. "Texas caselaw is mixed on this issue, varying based on the court of appeals authoring the opinion and the enjoined party's knowledge of the confidential class members it is prohibited from contacting." *Hernandez v. Combined Ins. Co. of Am.*,

10

No. 02-20-00225-CV, 2021 WL 520456, at *23 (Tex. App.—Fort Worth Feb. 11, 2021, pet. denied) (citing cases). In *Lockhart*, for example, the Waco Court of Appeals upheld an injunction that prohibited a former employee from soliciting his former employer's clients that he had served, dealt with, or represented while in his former employment, although the injunction did not list these clients by name. *Lockhart v. McCurley*, No. 10-09-00240-CV, 2010 WL 966029, at **4–5 (Tex. App.—Waco Mar. 10, 2010, no pet.) (mem. op.) (same). The court reasoned that the employee's personal experiences and interactions with these clients supplied the requisite knowledge for him to be able to abide by the injunction's terms. *See id.* at *4.

By contrast, other appellate courts "reject the proposition that an enjoined party's knowledge of which customers are off limits is a substitute for specificity in identifying those customers in an injunction order." *Hernandez*, 2021 WL 520456, at *24. For example, in *Computek Computer & Office Supplies, Inc. v. Walton*, the injunction order prohibited a company's ex-employee from transacting with any of the company's clients, except for 184 clients listed in an attachment to the order. 156 S.W.3d 217, 221 (Tex. App.—Dallas 2005, no pet.). Because the list identified the unrestricted clients rather than the restricted ones, the court reversed and remanded this portion of the order for lack of specificity. *Id*. at 222, 224. In so holding, the court reasoned that "the order granting an injunction 'shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail and *not by reference to the complaint or any other document*, the act or acts sought to be restrained'" and that "the injunction itself must provide the specific information as to the off-limits clients, without inferences or conclusions, or, in this case, implied references to other records Computek might have." *Id*. at 222 (quoting Tex. R. Civ. P. 683).

11

Multiple appellate decisions have followed *Computek* in invalidating injunctions that fail to specifically name off-limit client contacts. *McCaskill v. Nat'l Cir. Assembly*, No. 05-17-01289-CV, 2018 WL 3154616, at *4 (Tex. App.—Dallas June 28, 2018, no pet.) (mem. op.) ("As in *Computek*, the injunction itself does not provide the specific information about who the off-limits clients and customers are, and the lack of specificity cannot be cured by any knowledge [appellant] may have outside the injunction."); *In re Krueger*, No. 03-12-00838-CV, 2013 WL 2157765, at *9 (Tex. App.—Austin May 16, 2013, orig. proceeding) (mem. op.) (citing *Computek* as support for overturning contempt judgment because the underlying "injunction does not identify the individuals who [relator] is prohibited from contacting, and it requires [relator] to make inferences or conclusions concerning whom those individuals are."). Similarly, in *In re Krueger*, the Third Court of Appeals found an injunction's prohibition on contacting any "investors or potential investors, or any other persons doing business with or potentially a participant in the business of" the applicant to be inadequately specific. 2013 WL 2157765, at *6.

We agree with the *Computek* line of cases. Where a prohibition is to be enforced by power of contempt, it is not too much to ask for the court to specifically name those entities and individuals who are the subject of the prohibition. The temporary injunction order fails this specificity requirement with respect to its application to certain "subsidiaries" of entities on the list of Plaintiff's Buyers. The record contains no indication that LMP and Kreines are in a position to know which entities are and are not subsidiaries of ES3 customers. Unlike in *Lockhart*, such knowledge may fall outside the realm of Kreines's prior personal experience with ES3. Accordingly, we sustain Appellants' first issue with respect to the injunction pertaining to known subsidiaries of Plaintiff's Buyers.

## III. The Temporary Injunction Clearly Sets Forth the Reasons for Its Issuance.

In their second issue, Appellants argue that the temporary injunction does not clearly set forth the reasons for its issuance.

Rule 683 states in relevant part: "Every order granting an injunction . . . shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained . . . ." Tex. R. Civ. P. 683. A temporary injunction order must generally "set forth the reasons why the court deems it proper to issue the writ to prevent injury to the applicant in the interim; that is, the reasons why the court believes the applicant's probable right will be endangered if the writ does not issue." *Transport Co. of Tex. v. Robertson Transps.*, 261 S.W.2d 549, 553 (Tex. 1953). These requirements "are mandatory and must be strictly followed." *InterFirst Bank San Felipe, N.A. v. Paz Constr. Co.*, 715 S.W.2d 640, 641 (Tex. 1986) (per curiam). An order that does not strictly comply with Rule 683 is subject to being declared void and dissolved. *Qwest Commc'ns Corp. v. AT&T Corp.*, 24 S.W.3d 334, 337 (Tex. 2000).

Here, the temporary injunction stated that ES3 "has shown the loss of exclusive use of its Trade Secrets, a loss of deals with specific buyers, a decrease in gross profits, and a loss of employees, which is likely to continue unless Defendants are enjoined." Further, the defendants "were closely associated with [ES3]'s goodwill, and by their actions they have diluted [ES3]'s goodwill with [ES3]'s Buyers and will continue to do so." The order listed trade secret misappropriation, loss of goodwill and customers, and breach of noncompetition agreements as irreparable injuries that damages could not adequately remedy.

Appellants argue that these statements are conclusory and fail to sufficiently

state the reasons for irreparable harm, relying primarily on First Court of Appeals cases for support. *See Clark v. Hastings Equity Partners, LLC*, 651 S.W.3d 359, 374 (Tex. App.—Houston [1st Dist.] 2022, no pet.); *Home Asset, Inc. v. MPT of Victory Lakes Fcer, LLC*, No. 01-22-00441-CV, 2023 WL 3183322, at *2 (Tex. App.— Houston [1st Dist.] 2023, no pet.) (mem. op.). *Clark* found an injunction order's explanation for irreparable harm to be deficient based on the "conclusory" statements that the respondents had "violated certain covenants contained in the [] Securities Purchase Agreement and will, if not restrained, likely engage in conduct that will cause Petitioners to suffer immediate and irreparable injury, loss or damage; and . . . the threatened damage to Petitioners is impossible to accurately and fully assess." *Clark*, 651 S.W.3d at 374. *Home Asset* similarly found statements that the appellees would "suffer imminent and irreparable harm due to the denial of access to real property, the probable loss of [their] investment in such property and improvements and the likelihood of adversely affecting the contractual agreements would be difficult to measure unless a temporary injunction is granted" to be conclusory and inadequate to pass muster under Rule 683. *Home Asset*, 2023 WL 3183322, at *2 (alteration in original).

Here, the Business Court found the District Court's order to be more detailed than the orders in *Home Asset* and *Clark*, with "significantly more exposition than those in *Clark*." We agree. A conclusory statement is one that expresses a factual inference without providing underlying facts to support that conclusion. *See Arkoma Basin Expl. Co. v. FMF Assocs. 1990–A, Ltd.*, 249 S.W.3d 380, 389 n.32 (Tex. 2008). The District Court's statements of irreparable harm are supported by underlying facts in the order and are therefore not conclusory. For example, the order found "Defendants Ryan and Kreines were closely associated with Plaintiff's goodwill, and by their actions they have diluted Plaintiff's goodwill with Plaintiff's

Buyers and will continue to do so." Recognizing that attempts to assign "a dollar value to loss of customer goodwill and clientele" are fraught with difficulty, Texas courts routinely find that loss of goodwill can constitute an irreparable injury justifying injunctive relief. *RenewData Corp. v. Strickler*, No. 03-05-00273-CV, 2006 WL 504998, at *16 (Tex. App.—Austin Mar. 3, 2006, no pet.); *see also Tex. Dep't of State Health Servs. v. Holmes*, 294 S.W.3d 328, 334 (Tex. App.—Austin 2009, pet. denied); *Graham v. Mary Kay, Inc.*, 25 S.W.3d 749, 753 (Tex. App.— Houston [14th Dist.] 2000, pet. denied); *Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*, 281 S.W.3d 215, 228 (Tex. App.—Fort Worth 2009, pet. denied). The trial court's findings with respect to the loss of goodwill also distinguish this case from *Kotz v. Imperial Capital Bank*, which found Rule 683 unsatisfied by the trial court's conclusory justification that applicants would "suffer irreparable injury in their possession and use of the Subject Property in the event that the requested injunctive relief is not granted." 319 S.W.3d 54, 56-57 (Tex. App.—San Antonio 2010, no pet.).

Even if the District Court's reasoning could have been more specific, Rule 683 does not require an exhaustive exposition of the factual basis for irreparable harm. We overrule Appellants' second issue.

## IV. The $25,000 Bond Is Disproportionate and Does Not Adequately Protect Appellants.

In Appellants' third issue, they argue that the $25,000 bond imposed by the District Court and affirmed by the Business Court does not provide adequate security as required by Rule 684 of the Texas Rules of Civil Procedure. According to Appellants, Rule 684 requires an order granting a temporary injunction to fix a bond in an amount sufficient to compensate the defendant in the event that the injunction ultimately is dissolved. Appellants argue that a bond of $25,000 is inadequate because ES3 acknowledges that the amount in dispute is more than $5 million, and

the evidence showed that an injunction would immediately impair contracts worth $3.6 million.

Texas Rule of Civil Procedure 684 imposes a mandatory bond requirement for a temporary injunction:

> In the order granting any temporary restraining order or temporary injunction, *the court shall fix the amount of security to be given by the applicant*. Before the issuance of the temporary restraining order or temporary in-junction the applicant shall execute and file with the clerk a bond to the adverse party, with two or more good and sufficient sureties, to be approved by the clerk, in the sum fixed by the judge, conditioned that the applicant will abide the decision which may be made in the cause, and that he will pay all sums of money and costs that may be adjudged against him if the restraining order or temporary injunction shall be dissolved in whole or in part.

Tex. R. Civ. P. 684 (emphasis added). The amount of the bond is reviewed for an abuse of discretion, and courts review the adequacy of the bond on a case-by-case basis. *IAC, Ltd. v. Bell Helicopter Textron, Inc*., 160 S.W.3d 191, 203 (Tex. App.—Forth Worth 2005, no pet.); *Topheavy Studios, Inc. v. Do*e, No. 03-05-00022-CV, 2005 WL 1940159, at *7 (Tex. App.—Austin Aug. 11, 2005, no pet.) (mem. op.).

While Texas courts issue "thousands of injunctions each year," determining a bond's adequacy is a notoriously unsettled area of Texas law. *See Van Huis v. Marine Ventures, Ltd*., 672 S.W.3d 22, 22–23 (Tex. 2023) (Young, J., dissenting from denial of review). As Justice Young explained in his dissent from denial of review in *Van Huis*, although one might have expected the Texas Supreme Court to have issued "many opinions to guide Texas trial courts in exercising their discretion regarding injunction bonds," "one would be wrong to so presume." *Id*. at 23. Indeed, Texas "lower courts have long acknowledged the paucity of guidance from [the Texas Supreme Court]." *Id*.; *see Franklin Sav. Ass'n v. Reese*, 756 S.W.2d 14, 16 (Tex. App.—Austin 1988, no writ) (noting that "[n]either Rule 684 nor the case law

gives us much guidance in evaluating the sufficiency of the [injunction] bond"); *Currie v. Int'l Telecharge, Inc.*, 722 S.W.2d 471, 475 (Tex. App.—Dallas 1986, no writ) ("Surprisingly, there is little authority to guide" the analysis of whether an injunction bond is inadequate.). We join our voice to this chorus while offering our own analytical "flashlight" to chart our path in the dark.

Although the Texas Supreme Court has said little about bond adequacy, two big picture points are key to our analysis. First, the Texas Supreme Court has been clear about the purpose of the bond: it is to "protect the defendant from the harm he may sustain as a result of temporary relief granted upon the reduced showing required of the injunction plaintiff, pending full consideration of all issues." *DeSantis v. Wackenhut Corp.*, 793 S.W.2d. 670, 686 (Tex. 1990). Consequently, a bond must be up to the task of providing real protection for the defendant, or else Rule 684 is a nullity. Second, the bond is *mandatory*, not discretionary. The Texas Supreme Court has held that Rule 684's requirements are "mandatory and an order of injunction issued without a bond is void on its face." *Ex parte Lesher*, 651 S.W.2d 734, 736 (Tex. 1983). If the Court is serious enough about the bond to void an injunction for the lack of such a bond, then the bond must be adequate to have real value.

Justice Young recognized that these guideposts from the Texas Supreme Court shed some light on how a court may approach the task of evaluating an injunction's bond adequacy. He posed that "[i]f a comparatively minuscule bond is essentially no bond at all, how should our rules—which require a bond, and presumably a real one—respond? One possibility: a clear rule of proportionality." *Van Huis*, 672 S.W.3d at 26 (Young, J., dissenting from denial of review). We agree with this suggestion and hold that a bond must be proportionate to the degree of harm that an enjoined party will suffer if the injunction imposed proves to have been

unwarranted. Because Rule 684 requires the plaintiff to pay the defendant "all sums of money and costs that may be adjudged against him" if the injunction is dissolved, a trial court should consider the amount of monetary damages and costs that the defendant may sustain as a result of the injunction. Tex. R. Civ. P. 684; *see also Williard Cap. Corp. v. Johnson*, No. 14-16-00636-CV, 2017 WL 3567914, at *4 (Tex. App.— Houston [14th Dist.] August 17, 2017, no pet.) (mem. op.). The enjoined party would bear the evidentiary burden of proving the value of the assets or financial interests. *See Van Huis*, 672 S.W.3d at 25 (Young, J., dissenting from denial of review) ("[T]he case law and literature generally place the burden of proof on the enjoined party, who is best positioned to know and offer evidence as to how the injunction (if wrongful) could result in a certain quantifiable amount of harm.").

A proportionality standard would uphold the bond's aforementioned purpose: "protect[ing] the defendant from the harm he may sustain . . . ." *DeSantis*, 793 S.W.2d. at 686. A bond that is disproportionately lower than the estimated value of the assets or financial interests cannot be said to protect an enjoined party in any meaningful sense. However, this proportionality standard would not force a trial court to set the bond at the exact value of the interests claimed by the enjoined party. Rather, the determination ultimately remains "within the trial court's sound discretion . . . .". *IAC*, 160 S.W.3d at 203.

Turning to the case before this Court, the District Court set a bond of $25,000. Appellants challenged this amount in the Business Court arguing, as they do on appeal, that the bond was "nominal" and not sufficient to protect them from any possible damages occurring as a result of an improperly granted injunction. They state that this amount cannot cover the $3,595,415.00 they would receive from five signed contracts that have yet to close. Appellants noted that LMP had received approximately $20.2 million in gross revenue in the first ten months of 2024 with

18

profits totaling $6.7 million. Based on the potential revenue of the pending deals and LMP's historical revenues and profit margin, Appellants assert that the bond amount should be much higher than $25,000.

Appellants rely on *Franklin Savings Association v. Reese*, in which the court remanded an injunction due to a $10,000 bond inadequately protecting a bank's foreclosure interest in a property valued between $25 million and $50 million. 756 S.W.2d at 16. To further support its remand, the court noted that the bank's lost loan interest during the injunction period already exceeded $2 million, as well as the bank's inability to develop the property. *Id.*

Rather than gross revenue, ES3 contends that lost profits are the proper measure of the bond, and that no evidence in the record establishes such amount. ES3 relies on *Maples v. Muscletech, Inc.*, in which the court refused to stay an injunction because storeowners failed to prove that a $5,000 bond was insufficient protection despite their testimony of a probable $100,000 loss in revenue. 74 S.W.3d 429, 430 (Tex. App.—Amarillo 2002, no pet.). The court stated that the storeowners had the burden to prove "likely actual losses" rather than expected gross revenue. *Id.* at 432. Since only the storeowners had the information required to establish actual losses and failed to do so, the court found no abuse of discretion. *Id.*

The Business Court determined that the temporary injunction was not void for lack of a bond and that the amount was within the trial court's sound discretion. The Business Court declined to modify the bond amount, finding the bond sufficient for the modified order and that Appellants had not demonstrated a change in circumstances since the temporary injunction was granted.

Reviewing the record, a $25,000 bond constitutes an abuse of discretion. The record contains a declaration from Ryan that LMP will be "prevented from closing five deals that are under contract," with the total value of those deals amounting to

approximately $3,595,415.00. Further, Appellants have established LMP's prior high-dollar gross revenues of $20 million within the first 10 months of 2024, $6.7 million of which was profit. ES3 itself had previously suggested a much higher bond amount, asserting to the District Court that they could agree to a bond of $400,000. However, absent from the record is evidence that "reasonably supports" a bond amount of $25,000. *IAC*, 160 S.W.3d at 203. Rather, such an amount is disproportionate to the potential value of the interests that Appellants risk losing during the injunction period. This is not to say that we require that the bond be set at an amount as high as Appellants claim. We simply hold that there is no evidence that a bond of $25,000 is proportional to the harm the Appellants may sustain as a result of the grant of temporary relief.

As noted above, ES3 primarily relies on *Maples* to argue for a lost profits standard in determining a bond's adequacy. 74 S.W.3d at 432. Indeed, multiple appellate courts have also considered evidence of an enjoined party's profits in determining whether a trial court abused its discretion. *See, e.g.*, *IAC*, 160 S.W.3d at 203 ("Furthermore, nothing in the record shows that appellants' lost profits for the duration of the injunction would exceed $350,000."); *Topheavy*, 2005 WL 1940159 at *8 ("Topheavy introduced no evidence regarding the profit margin on the sale of each game."). However, although these cases consider an enjoined party's profits, they do not treat lost profits as a strict standard binding the trial court's decision. An enjoined party's estimated profit losses during the injunction period may be an important consideration in determining an adequate bond amount, but the trial court's decision is not limited to this measure.

For these reasons, we sustain Appellants' third issue. The bond amount is inadequate and violates Rule 684, which warrants remand to the Business Court.

**V.  Appellants Did Not Raise Determinations of Right to Relief and Irreparable Harm in the Business Court.**

Appellants' fourth issue concerns whether the evidence supports a finding of a probable right to relief and imminent and irreparable harm. Appellants did not raise this issue in their motions before the Business Court to modify and/or dissolve the injunction. The Business Court did not hear evidence on these points, and the parties did not ask the Business Court to reconsider the evidence presented to the District Court on these issues. We therefore decline to review them.

On remand, should the Business Court adopt the reasoning of the District Court with respect to the remainder of the temporary injunction order, this Court can review the Appellants' remaining appellate issues.

### CONCLUSION

We reverse the portion of the temporary injunction setting the amount of the bond and remand to the Business Court with instructions to conduct an evidentiary hearing to determine and set a proportionate bond prior to trial. We reverse the portion of the temporary injunction pertaining to known subsidiaries of Plaintiff's Buyers and remand for further proceedings consistent with this opinion. We dismiss Ryan's challenge to the temporary injunction as moot. We do not disturb the remainder of the temporary injunction.

<u>/s/ April Farris</u>
April Farris
Justice

Before Chief Justice Brister and Justices Field and Farris.

21